IN THE MATTER OF APPEAL OF GEORGE GONZALES
FROM AN ORDER ADJUDGING HIM GUILTY OF CON-
TEMPT OF THE HUDSON OYER.

Argued June 7, 1910—Decided November 5, 1910.

On appeal from conviction of contempt.

Before Justices PARKER and BERGEN.

For the appellant, *Merritt Lane.*

*Contra, Pierre P. Garven,* prosecutor.

The opinion of the court was delivered by

PARKER, J. This is an appeal from an adjudication of con-
tempt of the grand jury of Hudson county rendered in the
Hudson Oyer and Terminer. The appeal is taken pursuant
to the act of 1884 (*Gen. Stat.,* p. 2600, *pl.* 381, 382). The
appellant was in attendance before the grand jury as a wit-
ness, and in the original moving affidavit made by the clerk of
the grand jury, it was alleged that appellant, in the presence
of the grand jury, did maliciously and unlawfully refuse to
answer material, pertinent and relevant questions put to him
by the members of the grand jury concerning a certain com-
plaint mentioned in the affidavit; that he spoke contempt-
uously to the grand jury and contemned their authority and
dignity by stating in their presence that the investigation in
question was not in good faith and that the grand jury would
whitewash the person accused; meaning thereby that the
grand jury would return no indictment against such person,
even though it should become their duty, under the law and
their oaths, to return an indictment against him; also that
the appellant maliciously insulted, defamed and abused said
grand jury and the members thereof, and that the said
appellant was repeatedly warned by the foreman to conduct

himself in an orderly and gentlemanly manner, and that he refused so to conduct himself.

Upon this affidavit a rule to show cause was issued why the appellant should not be adjudged guiltly of contempt of the Court of Oyer and Terminer. On the return of the rule he appeared by counsel and objected to its form, and his objection was overruled. The grand jury clerk was then sworn and testified substantially as follows:

"I asked him if he was mayor of the city of Hoboken, and his answer was yes, and I asked him if he was for a time a member of the common council of Hoboken, and he said yes, and I asked him if he had furnished information to Kauffman on which a complaint had been made against one Frederick Steigleiter, and he said, I have; and I said, have you taken up the matter as chief executive of the city, and he said I have; and I said now Mr. Gonzales, there is one thing lacking in our case at this time, we have called Mr. Kauffman and Mr. Allen. Will you give us any evidence or information that Mr. Steigleiter has ever received any money for granting building permits? and he immediately replied that he didn't know what that had to do with the examination, and he didn't wish to have the matter go further, and that he was convinced that the grand jury was there to whitewash Mr. Steigleiter." He further testified that the appellant, in substance, answered the questions put to him by the grand jury.

"*Q.* Is that all you wanted?

"*A.* If he had said it in a decent way I would have been satisfied.

"*Q.* Then it was his manner that offended?

"*A.* Yes; personally I had nothing against him.

"*Q.* You got the information you asked for?

"*A.* I got it only in this vague way. My question was to him as to what evidence he had, and I was lawyer enough to know that the information Mr. Gonzales was giving was absolute hearsay evidence."

He further testified that Gonzales gave the name of the man from whom he got his information.

At the close of the examination of this witness the court decided to order a writ of attachment to issue and postpone the further hearing of the case until the interrogatories should be served, and fixed the bail at $1,000. The appellant gave bail accordingly; it was arranged between counsel that the interrogatories should be served at once and the court fixed a further day when the appellant should appear and answer them. On that day it appeared that no writ of attachment had actually been issued, but the court ruled without objection that the case should proceed as though a writ had been issued. Counsel for appellant then moved to vacate the writ on a number of grounds, and the court denied his motion. He then offered a sworn statement of the appellant verifying the answers to the interrogatories, with an additional statement not in answer to interrogatories, for the purpose of—*first,* showing that the writ was improperly issued; *secondly,* as an answer to the interrogatories, and *thirdly,* as an answer to the writ of attachment, for the purpose of showing facts and circumstances surrounding the commission of the alleged contempt, and which would tend to purge the appellant. All these motions were denied. Counsel then moved to extend the time for answering the interrogatories on the ground that the time given was unreasonably short; and this motion was also denied.

The interrogatories were then put orally, and appellant read the answers thereto from the document which had already been offered and refused by the court. This proceeding being concluded and counsel having argued the matter, the court rendered the following decision:

"The Court—I think it cannot be seriously denied that if this respondent conducted himself in the way the clerk of the grand jury said he conducted himself, that he was guilty of contempt of court. According to that proof, his manner, to say the least, was wholly unbecoming, and his words, if the statement of the clerk is to be taken as true, were highly insulting and contemptuous, imputing to the grand jury corrupt motives, practically charging them with a deliberate purpose to violate their oaths and a disposition to disregard

utterly their sworn duties as members of the grand jury and as a branch of the court. It is quite clear that the testimony of the clerk established that situation, and that attitude of the accused towards the grand jury. He had a right to acquit himself by a full, square, straightforward denial of these allegations made by the applicant in this proceeding. He has not done that. He has made a statement under oath, in response to the interrogatories, partly admitting and partly denying the case as presented by the applicant, and which, of course, is the basis of this proceeding. It seems to me that from his statement, taking the statement of the clerk and his statement in comparison, that the supposed indignity of being kept in the corridor some time before being admitted to the grand jury, and the fact that he was the mayor of the city of Hoboken, and the irritation which resulted from his treatment when he got into the grand jury room, were in his mind a sufficient excuse for the unseemly conduct—if I believe the testimony for the state—which he was guilty of there. We are dealing with Mr. Gonzales, a witness before the grand jury, and not with Mr. Gonzales, the mayor of Hoboken, and it is in that light, as a witness only, that he is to be regarded here. The presumption of superiority that says, 'I am holier than thou,' whether true or false, has never had any such consideration and confirmation in the law as to justify indiscriminate calumny. Now, I am not satisfied, from the testimony as it stands before me, and giving full force to the answers made to these interrogatories, that this accused has either purged himself or satisfactorily excused his conduct; and that being so, the court adjudges him guilty of contempt as charged in these allegations. And the punishment to be inflicted on this accused is that he pay a fine of $100."

Our duty under the statute cited is to hear the matter both upon the law and the facts and give such judgment in the premises as shall seem to be lawful and just under all the circumstances of the case. It was held in the case *In re Cheesman,* 49 *N. J. L.* 115, that the Supreme Court will not consider the general policy of punishing contempts of this

class, and if according to the law and the facts the judgment appealed from is lawful and just, it will be affirmed. The present inquiry therefore is whether the judgment in this case was lawful and just.

Stripping the case of all the technical points made by appellant's counsel, it is reduced to the question whether the appellant, by his answers to the interrogatories, fully purged himself of any contempt that appeared by the evidence of the clerk of the grand jury to have been committed. By this we mean the evidence given by the clerk in open court, and not the original affidavit on which the rule to show cause was based, this having spent its force by the making of the rule.

Our examination of the interrogatories and of the answers satisfies us that appellant fully and fairly denied all allegations of specific acts that would tend to show him guilty of contempt, and that as to the conclusions embodied in these interrogatories, he was either not required to answer them or did answer them in a satisfactory manner.

The interrogatories are nineteen in number.

The first five of them have no bearing upon the real question. The first important one is—

Number 6.

"*Q.* Did you thereupon refuse to furnish the grand jury with such information?" (Referring to information desired by the grand jury with reference to fees alleged to have been unlawfully collected by Steigleiter.)

"*A.* No, in response to Mr. Clark's question, I said to him I hadn't any information, but I gave him the name of a man whom I thought had the information. I further told him that I had present in my bag, which had been previously taken into the grand jury room by Horace L. Allen, city attorney of Hoboken, what I had been advised by counsel was legal proof from the city books that Steigleiter had received moneys which he had not accounted for, and I was not asked to submit this proof to the grand jury."

Number 7.

"*Q.* Did you give to the grand jury all of the information in your possession with respect to the complaint against Fred-

erick Steigleiter for embezzlement of fees as building inspector of Hoboken?" To this the witness answered, "No, that he had the evidence with him which he had referred to, but was not asked for it."

Number 8.

"Q. Did you use offensive language in the presence of the grand jury?

"A. No, no language which I consider offensive."

Number 9.

"Q. Did you speak disrespectfully of, and to, the grand jury?" To this witness answered, "No, nothing which I considered disrespectful."

Number 10.

"Q. Did you impugn the methods by which the grand jury was conducting its investigation into the Steigleiter case?" To which he answered, that if by impugn was meant criticism of, or of objection to, the methods pursued in his examination, he answered that he was subpœnaed to be present at half-past one, and he was there; that the grand jury arrived about half-past two, and that he was not called until four o'clock; that Mr. Kauffman, the comptroller, and Allen, the city attorney, who had the same information he had, had been before the grand jury, and had taken in with them the documentary evidence which he had; that when he was called in the grand jury room the clerk of the grand jury stated that in order to find an indictment against Steigleiter it was necessary to have proof that he had taken a specific sum of money from a particular person for a permit, and had failed to pay that particular sum over to the city, and asked if he knew of any such particular case of his own knowledge, and when he asked for this information, which he must have known I didn't have, and failed to ask me for the evidence that I had, it seemed to me that Mr. Clark was not pursuing the right method to get at the evidence, and I protested against that method, and I drew to his attention the evidence that I had in my bag and offered it to him, but he did not accept my offer. I took out of my bag several books, such as I have described before, and proffered them to him, but I could not get him to look at this

evidence. This conduct of Mr. Clark's made me very much excited and disturbed in my mind, as it seemed to me that this method of handling the case could not lead to an indictment, and my recollection is that I then said to Mr. Clark that if he or the grand jury would not listen to the evidence I had, but had made up their minds, there was no use of keeping me any longer.

Number 11.

"*Q.* Did you charge the grand jury with attempting to whitewash the Steigleiter case?" To this the witness answered, "No," but further stated that he was told by one of the members of the grand jury, "You said something in Hoboken about this grand jury, what was it?" and in reply to this the witness said that he had said in Hoboken that the grand jury had as yet done nothing, and that he did not propose to let the case sleep, but intended to watch the matter, and in a direct answer to further questions said that rumors had come to him that the grand jury intended to whitewash the Steigleiter case.

Number 12.

"*Q.* Did you say to the grand jury that it had sufficient evidence before it upon which to find an indictment without any evidence from you?" To this he answered that he had said in reply to Mr. Clark's question, as to whether he knew of an individual case that he had no such proof, and did not consider it necessary, in view of the other proof which he had, and which he tendered to the grand jury.

Number 13.

"*Q.* Did you thereafter say in the presence of the grand jury that you believed the grand jury would not indict Steigleiter, or words to that effect?" To this he said, "I simply repeated to them rumors which I had heard as related in my answers to No. 10."

Number 14.

"*Q.* Did you say in the presence of the grand jury that you believed the grand jury wanted to whitewash the Steigleiter case, or words to that effect?" To this he answered, "The same as No. 13."

Number 15.

"*Q.* Did you say to the grand jury that there was no need of your giving evidence; that they had prejudged the case, or words to that effect?" To this he replied that his answer was contained in answer to No. 10.

Number 16.

"*Q.* Were you called to order by the foreman of the grand jury for misbehaving yourself as a witness?

"*A.* The foreman called for order several times; I do not recollect what he said; I did not misbehave myself."

Number 17.

"*Q.* Did you say to the grand jury that it was their duty to have investigated the Steigleiter case sooner, or words to that effect?

"*A.* In the course of a rapid cross-examination, as related in my answer to interrogatory No. 10, members of the grand jury questioning me as rapidly as they could, and I endeavoring to answer, I think that in response to a question asked me by one of the grand jurors, having reference to what I said in the city of Hoboken before the tax board, I stated that I thought the Steigleiter matter should have been disposed of sooner."

Number 18 was stricken out.

Number 19.

"*Q.* Did you say to the grand jury that they had no business to keep you waiting for two hours in the corridor of the court house, or words to that effect?"

To this the witness answered, "No, I do not recollect that I did." He then went on to say that in the midst of a rapid fire of questions, he did say that he thought the grand jury ought not to summon women as witnesses at half-past one and then not meet itself until an hour or so later, and keep these women in the cold corridor.

It will be observed that appellant did not specifically deny saying what was implied in the question, but we do not think that if he had said this, it would amount to a contempt.

So far as interrogatories Nos. 8, 9, 10 and 16 are concerned, they involve pure conclusions and should not have been put to the appellant. It was manifestly impossible for him to answer them in any other way than by giving his own opinion of his behavior.

Interrogatories Nos. 6, 11, 13 and 14 were answered by adequate denials. To No. 7 appellant not improperly answered that he did not give the grand jury all information in his possession because he was not asked for it.

The answer to No. 12 amounted to an adequate denial of the accusation in manner and form as made.

The answer to No. 15, which is contained in the answer to No. 10, puts the words used by appellant in such form as to show that no contempt was intended or committed.

Nos. 17 and 19 have already been treated.

On the whole, therefore, we think that appellant fully and fairly purged himself of any contempt, legally implied in the interrogatories, and which was testified to by the grand jury clerk. If his denial was adequate, it must be taken as true. *In re Cheesman,* 49 *N. J. L.* (at *p.* 143) ; 4 *Bl.* 287; 2 *Arch. Pr.* (*7th ed.*) 1272, and cases cited; 9 *Cyc.* 44.

We think, therefore, that the finding that the appellant was guilty of contempt necessarily, and from a reading of the decision of the Oyer we should say confessedly, was based on the allegations in the testimony of the grand jury clerk, which were contradicted by appellant, and in the face of such contradiction. But the court had no right to weigh the evidence, as has just been pointed out. If the contradiction was full and adequate, the appellant was entitled to his discharge.

The judgment and finding of the Hudson Oyer that appellant was guilty of contempt is accordingly reversed and set aside.